**Relief Requested**
**Without a Hearing**

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MARK R. LEBEL, SR., d/b/a | ) | Chapter 7 |
| M.R. LEBEL BUILDING AND | ) | Case No. 14-20629 LHK |
| REMODELING, d/b/a LEBEL BUILDERS, | ) | |
| and DONNA M. LEBEL, | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| PEOPLE'S UNITED BANK, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARK R. LEBEL, SR., d/b/a | ) | |
| M.R. LEBEL BUILDING AND | ) | |
| REMODELING, d/b/a LEBEL BUILDERS, | ) | |
| and DONNA M. LEBEL, | ) | |
| | ) | |
| Debtors, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| P.J. PERRINO, JR., ESQ., Trustee, | ) | |
| | ) | |
| Respondents. | ) | |

## CONSENT MOTION FOR RELIEF FROM AUTOMATIC STAY

NOW COMES People's United Bank (the "Bank"), with the consent of the Chapter 7

Trustee (the "Trustee") and Mark R. Lebel, Sr., d/b/a M.R. Lebel Building and Remodeling,

d/b/a Lebel Builders ("MRL") and Donna M. Lebel (together, "Debtors") (the Bank, the Trustee,

and Debtors, collectively, the "Parties"), by and through its counsel undersigned, pursuant to 11

U.S.C. § 362(d), Federal Rules of Bankruptcy Procedure 4001 and 9013, and D. Me. LBR 4001-

{P0134355.1}

1(g), 9013-1(d)(1), (g)(2)(ii), and 9019-1(b), and requests relief from the automatic stay provided

under 11 U.S.C. § 362(d).  In support of its Motion, the Bank states as follows:

## Jurisdiction

1.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  This is

a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), and (O).  Venue is proper before

this Court pursuant to 28 U.S.C. § 1409(a).

## Background

2.      On August 8, 2014, Debtors filed a voluntary petition under Chapter 7 of the

United States Bankruptcy Code (the "Code").

3.      Property of the estate includes certain real property located at 6 Eastern Avenue,

Falmouth, Cumberland County, Maine 04105 (the "Property").

4.      On March 15, 2004, MRL executed and delivered to Maine Bank & Trust

Company ("MB&T") a certain Credit Agreement and Disclosure (the "Note"), with a credit limit

in the amount of $150,000, a true copy of the Note is attached hereto as Exhibit A.

5.      To secure the Note, on March 15, 2004, Debtors executed and delivered to

MB&T a certain Mortgage (the "Mortgage"), which Mortgage is recorded in the Cumberland

County Registry of Deeds in Book 20983, Page 8, a true copy of which Mortgage is attached

hereto as Exhibit B.

6.      The Bank is the successor in interest to MB&T and is the current holder of the

Note and the Mortgage.

## Discussion

7.      MRL is in default of his obligations to the Bank under the Note.  Debtors are in

default of their obligations to the Bank under the Mortgage.

8.      The current monthly payment amount due under the Note is $1,676.81.  As of
September 4, 2014, the total payment arrearage under the Note was $68,439.62.  That arrearage
consists of the following past due payments:

(i)     Prepetition – May 2011 through July 2014; and
(ii)    Post-petition – August and September 2014.

9.      As of September 4, 2014, the total amount due under the Note was $178,848.95
(consisting of: principal – $151,197.42; accrued interest – $16,949.44; and fees – $10,702.09).[1]

10.     Debtors estimate the fair market value of the Property to be $185,000.  *See*
Schedule D.

11.     The Bank is unaware of any other existing liens or encumbrances on the Property,
except as follows:  (i) Bank of America has a mortgage interest on the property in the amount of
$224,870.00; (ii) C.W. Baldwin & Son, Inc. has a scheduled lien on the property in the amount
of $4,780.24; (iii) Cach LLC has a scheduled lien on the property in the amount of $5,618.00;
(iv) Discover Bank has a scheduled lien on the property in the amount of $1.00; (v) the Internal
Revenue Service has a scheduled 2008 tax lien on the Property in the amount of $15,188.01, a
scheduled 2012 tax lien on the Property in the amount of $5,984.05, a scheduled 2004 and 2007
tax lien on the Property in the amount of $36,635.00, a scheduled 2009 tax lien on the Property
in the amount of $9,786.03, and a scheduled 2011 tax lien on the Property in the amount of
$8,824.84; (vi) the Maine Revenue Service has a scheduled 2008 tax lien on the Property in the
amount of $1,561.76, a scheduled 2006 tax lien on the Property in the amount of $1,068.32, a
scheduled 2005 tax lien on the Property in the amount of $9,852.44, a scheduled 2009 tax lien on
the Property in the amount of $2,554.68, and a scheduled 2007 and 2010 tax lien on the Property
in the amount of $1,969.65; (vii) Strategic Recovery Group has a scheduled junior mortgage

---

[1] Plus all allowable and accruing interest, costs, and expenses due under the Note.

interest in the Property in the amount of $16,649.77; and (viii) the Town of Bridgton has a

scheduled municipal tax lien on the Property in the amount of $382.63. *See* Schedule D.

12.     Pursuant to § 521 of the Code, Debtors have not stated or performed their

intention with respect to the Property. Accordingly, "cause" exists for purposes of 11 U.S.C. §

362(d)(1). Further, Debtors consent to the relief requested in this Motion.

13.     Based upon the foregoing, "cause" also exists within the meaning of § 362(d) of

the Code to grant the Bank relief from the automatic stay to foreclose its mortgage interest in the

Property, and to pursue its other state law rights and remedies, as appropriate. *See* D. Me. LBR

4001-1(b)(1). Specifically:

(i)     The Bank's interest in the Property is not adequately protected. *See* 11 U.S.C. §
        362(d)(1);
(ii)    the Property is of no or inconsequential value to the estate. *See* 11 U.S.C. §
        362(d)(1);
(iii)   Debtors lack equity in the Property. *See* 11 U.S.C. § 362 (d)(2)(A); and
(iv)    the Property is not necessary to an effective reorganization of Debtors in this
        Chapter 7 case pursuant to § 362(d)(2)(B).

14.     The Bank will not seek a deficiency judgment against MRL personally to the

extent that a discharge is granted with respect to the Note.

15.     For all these reasons, the Parties stipulate, consent, and agree to the termination of

and relief from the automatic stay pursuant to § 362(d) of the Code with respect to the Property.

*See* D. Me. LBR 4001-1(g) and 9019-1(b).[2]

WHEREFORE, People's United Bank requests that this Court grant it relief from the

automatic stay to pursue its state law rights and remedies with respect to the Property, and

provide the Bank with such other and further relief as is just and appropriate under the

circumstances.

---

[2] Pursuant to D. Me. LBR 4001-4(c), the Parties waive any hearing with respect to relief requested in the Motion.

- 4 -

Dated at Portland, Maine this 10th day of September, 2014.

/s/ Shawn K. Doil
Shawn K. Doil, Esq.
Counsel for Movant,
People's United Bank

Perkins Thompson, P.A.
One Canal Plaza, PO Box 426
Portland, ME  04112-0426
(207) 774-2635
sdoil@perkinsthompson.com

**SEEN AND AGREED TO BY:**

/s/ Joseph L. Goodman
Joseph L. Goodman, Esq.
Counsel for Debtors,
Mark R. Lebel, Sr., d/b/a
M.R. Lebel Building and Remodeling,
d/b/a Lebel Builders and
Donna M. Lebel

**SEEN AND AGREED TO BY:**

/s/ P.J. Perrino, Jr.
P.J. Perrino, Jr., Esq.
Chapter 7 Trustee

## CERTIFICATE OF SERVICE

I, Shawn K. Doil, Esq., hereby certify that, pursuant to D. Me. LBR 4001-1(a) and 9042-1, I have caused to be served true copies of the Consent Motion for Relief from Automatic Stay, the proposed Order, and this Certificate of Service upon each of the parties set forth on the Service List below, via First Class U.S. mail, postage fully prepaid, on this date.

All other parties listed on the Notice of Electronic Filing have been served electronically on this date.

Dated at Portland, Maine this 10th day of September, 2014.

/s/ Shawn K. Doil
Shawn K. Doil, Esq.
Counsel for Movant,
People's United Bank

Perkins Thompson, P.A.
One Canal Plaza, PO Box 426
Portland, ME  04112-0426
(207) 774-2635
sdoil@perkinsthompson.com

## Service List

Mark R. Lebel and
Donna M. Lebel
191 Delaware Court
Portland, ME  04103

Elizabeth Dougherty, Vice President (via email only)
People's United Bank

‑ᴜⁿ )ᵁ¹¹ ¹¹:¹⁰ ʳᴬᴬ ³⁰² ⁶⁸⁰ ⁷⁴²³                    LOAN VAUL )

                                                                    ☑006

## CREDIT AGREEMENT AND DISCLOSURE  ORIGINA

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Init |
|---|---|---|---|---|---|---|---|
| $150,000.00 | 03-15-200 | | 20470 | 1012 15 | | 025 | |

References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omited due to text length limitations.

**Borrower:**  Mark R. Label
6 Eastern Avenue
Falmouth, ME 04105

**Lender:**  Maine Bank & Trust Company
Falmouth Branch
188 US Route 1
Falmouth, ME 04105

**CREDIT LIMIT: $150,000.00**

**DATE OF AGREEMENT: March 15, 20**

**Introduction.** This Credit Agreement and Disclosure ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") ss through Maine Bank & Trust Company. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who s this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean Maine Bank & Trust Company. You agree the following terms and conditions:

**Promise to Pay.** You promise to pay Maine Bank & Trust Company, or order, the total of all credit advances and FINANCE CHARGES, together all costs and expenses for which you are responsible under this Agreement or under the "Mortgage" which secures your Credit Line. You will pay yo Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is jointly and severally liable on t Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to a Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and recei credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower fro responsibility under this Agreement, and the others will remain responsible.

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue as follows: until the termination you Home Equity Credit Line account. All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will due and payable at the end of this term. The draw period of your Credit Line will begin on a date, after the Opening Date, when the Agreement accepted by us in the State of Maine, following the expiration of the right to cancel, the perfection of the Mortgage, the receipt of all required certificate of noncancellation, and the meeting of all of our other conditions and will continue as follows: the draw period shall extend for sixty (60) months. Yo may obtain credit advances during this period ("Draw Period"). After the Draw Period ends, the repayment period will begin and you will no longer b able to obtain credit advances. The length of the repayment period is as follows: the repayment period, (sometimes called the "payment period") wi begin immediately following the draw period and shall extend for one-hundred twenty (120) months. You agree that we may renew or extend th period during which you may obtain credit advances or make payments. You further agree that we may renew or extend your Credit Line Account.

**Minimum Payment.** Your "Regular Payment" will equal the amount of your accrued FINANCE CHARGES ("First Payment Stream") You will make 6( of these payments. Your payments will be due monthly. An increase in the ANNUAL PERCENTAGE RATE may increase the amount of your Regular Payment.

After completion of the First Payment Stream, your "Regular Payment" will be based on a percentage of your balance at the start of this payment period plus all accrued FINANCE CHARGES as shown below or $100.00 plus all accrued FINANCE CHARGES, whichever is greater ("Second Payment Stream"). Your payments will be due monthly.

| Range of Balances | Number of Payments | Regular Payment Calculation |
|---|---|---|
| All Balances | 120 | 0.833% of your balance at the start of the repayment period plus all accrued FINANCE CHARGES |

Your "Minimum Payment" will be the Regular Payment, plus any amount past due and all other charges. An increase in the ANNUAL PERCENTAGE RATE may increase the amount of your Regular Payment.

In any event, if your Credit Line balance falls below $100.00, you agree to pay your balance in full. You agree to pay not less than the Minimum Payment on or before the due date indicated on your periodic billing statement.

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied first to any amounts that exceed your Credit Limit; then to Finance Charges; and then to unpaid principal.

**Receipt of Payments.** All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address prior to 2:00 PM Eastern Standard Time on any business day will be credited to your Credit Line as of the date received. If we receive payments at other locations, such payments will be credited promptly to your Credit Line, but crediting may be delayed for up to five (5) days after receipt.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of One Hundred Fifty Thousand & 00/100 Dollars ($150,000.00), which will be your "Credit Limit" under this Agreement. During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights. You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Mortgage covering your principal dwelling.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement. the Mortgage or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Mortgage for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

**Credit Line Checks.** Writing a preprinted "MB&T Home Equity Check" that we will supply to you.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one of you telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor MB&T Home Equity Checks in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the MB&T Home Equity Check.

**Post-dated Checks.** Your MB&T Home Equity Check is post-dated. If a post-dated MB&T Home Equity Check is caid and as a result any other check is returned or not paid, we are not responsible.

**Stolen Checks.** Your MB&T Home Equity Checks have been reported lost or stolen.

**Unauthorized Signatures.** Your MB&T Home Equity Check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement.
Home Equity Check.

If we pay any MB&T Home Equity Check under these conditions, you must repay us, subject to applicable laws, for the amount of the MB&T Home Equity Check. The MB&T Home Equity Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return MB&T Home Equity Checks along with your periodic billing statements; however, your use of each MB&T Home Equity Check will be reflected on your periodic statement as a credit advance. We do not "certify" MB&T Home Equity Checks drawn on your Credit Line.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

**Credit Line MB&T Home Equity Check Limitations.** There are no transaction limitations for the writing of MB&T Home Equity Checks.

**Authorized Signers.** The words "Authorized Signer" on MB&T Home Equity Checks as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**EXHIBIT A**

09/2/    )11 11:11 FAX 802 880 7423        LOAN VAULT*      )                    ⓩ007

Loan No: 2047039                  **CREDIT AGREEMENT AND DISCLOSURE**
                                            (Continued)

                                                                                          Page 2

**Lost MB&T Home Equity Checks.** If you lose your MB&T Home Equity Checks or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (207) 781-3131. You also can notify us at Maine Bank & Trust 467 Congress Street, Portland, ME.

**Prohibited Uses.** You agree not to use any Credit Line credit advances under this Agreement to finance or to refinance the acquisition of any real estate securing this Agreement if the real estate is used as your primary residence.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by a mortgage of even date.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Mortgage, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**Right of Setoff.** To the extent permitted by applicable law, we reserve a right of setoff in all your accounts with us (whether checking, savings, or some other account), including without limitation, all accounts you may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. You authorize us, to the extent permitted by applicable law, to charge or setoff all sums owing on this Agreement against any and all such accounts.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement. It will show, among other things, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** A daily FINANCE CHARGE will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "average daily balance" method. To get the average daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid FINANCE CHARGES. This gives us a daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "average daily balance."

**Method of Determining the Amount of FINANCE CHARGE.** Any FINANCE CHARGE is determined by applying the "Periodic Rate" to the balance described herein. Then we multiply by the number of days in the billing cycle. This is your FINANCE CHARGE calculated by applying a Periodic Rate.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** Initially, we will apply the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. Initially, we will apply the discounted rates shown herein. Thereafter, we start with an independent index which is the National Prime Rate as published in the Wall Street Journal (the "Index"). We will use the most recent Index value available to us as of the last business day of the month prior to the rate change date any ANNUAL PERCENTAGE RATE adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Credit Line Account, we may designate a substitute index after notice to you. To determine the Periodic Rate that will apply to your First Payment Stream, we add a margin to the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE for your First Payment Stream, we add a margin to the value of the Index, then divide the value by the number of days in a year (daily). To determine the Periodic Rate that will apply to your Second Payment Stream, we add a margin to the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE for your Second Payment Stream. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Any increase in the Periodic Rate will take the form of higher payment amounts. Adjustments to the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE resulting from changes in the Index will take effect once per month. Increases or decreases in the periodic rate will take effect on the 11th of each month. The maximum amount by which the ANNUAL PERCENTAGE RATE may increase at any one time is unlimited, subject to the maximum rate allowable by law or any ceiling rate as indicated above. In no event will the corresponding ANNUAL PERCENTAGE RATE be more than the lesser of 18.000% or the maximum rate allowed by applicable law. Today the index is 4.000% per annum, and therefore the initial Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line are as stated below:

### Rates During the Discount Period

| Term of Discount Range of Balances | Discounted Rate | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| First 6 payments | | | |
| All Balances | 3.490% | 3.490% | 0.00956% |

The term of the discount period is 6 payments.

This means six billing cycles whether or not payments are actually due.

### Current Non-discounted Rates for the First Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 1.250% | 5.250% | 0.01438% |

### Current Non-discounted Rates for the Second Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 1.250% | 5.250% | 0.01438% |

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set forth below:

**Fee to Stop Payment.** Your Credit Line Account may be charged $15.00 when you request a stop payment on your account.

**Other Charges.** Your Credit Line Account may be charged the following other charges: Fee to Cancel Credit Line. The amount of this other charge is: refer to paragraph entitled 'Expense Reimbursement Due Upon Cancellation of Credit Line Within Two Years'.

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement after we give you any notice of default and opportunity to cure required by applicable law. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all

11 11:11 FAX 802 860 7423          LOAN VAULT

⚠008

Loan No: 2047039

# CREDIT AGREEMENT AND DISCLOSURE
## (Continued)

Pag

persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclos
by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Cr
Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account.
Includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent
may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change
your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categor
of material obligations include the events described above under Termination and Acceleration, obligations concerning maintenance or use of the property or proceeds, obligatio
and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligatio
perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information
us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of a
comaker.

(4) We are precluded by government action from imposing the ANNUAL PERCENTAGE RATE provided for under this Agreement

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less tha
one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change wi
unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to ou
data processing systems). If the index is no longer available, we will choose a new index and margin. The new index will have an historica
movement substantially similar to the original index, and the new index and margin will result in an ANNUAL PERCENTAGE RATE that
substantially similar to the rate in effect at the time the original index becomes unavailable. We may prohibit additional extensions of credit o
reduce your Credit Limit during any period in which the maximum ANNUAL PERCENTAGE RATE under your Credit Line Account is reached.

**Collection Costs.** If you default and we foreclose on the Property securing this Agreement, you agree to pay our reasonable expenses, including
permissible fees, incurred in realizing on the real estate security interest.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all MB&T Home Equity Checks and any other
access devices. Any use of MB&T Home Equity Checks or other access devices following suspension or termination may be considered
fraudulent. You will also remain liable for any further use of MB&T Home Equity Checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If
we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your
account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us and return all MB&T Home Equity Checks
and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid
us all amounts due under this Agreement.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive all
accrued FINANCE CHARGES, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to
continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us
payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights
under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts,
including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered
with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Maine Bank & Trust Company, Falmouth
Branch, 188 US Route 1, Falmouth, ME 04105.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written
notice of a different address. You agree to advise us promptly if you change your mailing address.

**Credit Information and Related Matters.** You authorize us to release information about you to third parties as described in our privacy policy and our
Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law. You agree that, upon our request, you
will provide us with a current financial statement, a new credit application, or both, on forms provided by us. You also agree we may obtain credit
reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse
change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal
inspection, at our sole option and expense.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and
obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Mortgage. Your rights under this Agreement
belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any
such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever
concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our
employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on
this subject.

**Notify Us of Inaccurate Information We Report To Consumer Reporting Agencies.** Please notify us if we report any inaccurate information about
your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following
address: Maine Bank & Trust Company, Falmouth Branch, 188 US Route 1, Falmouth, ME 04105

**Expense Reimbursement Due Upon Cancellation of Credit Line Within Two Years**
. Except as provided in your Notice of Right to Cancel, if you otherwise ask us to close, cancel, refinance or modify the terms of your Credit Line within
two years of the date of the Credit Agreement, we will charge you for the initial costs that we incurred when we opened your Credit Line. These costs
will include certain fees that we paid to third parties such as appraisers, credit reporting firms and attorneys, or a minimum documentation preparation
amount of $250. We will either collect these costs from you at the time of your request or add these costs to the payoff balance of your loan, depending
on the nature of the request. The amount of these costs for your Credit Line is $250.00.

**Governing Law.** This Agreement will be governed by and interpreted in accordance with federal law and the laws of the State of Maine. This
Agreement has been accepted by us in the State of Maine.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions
of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Mortgage, is the best evidence of your agreements with us. If we go to court for any
reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Mortgage or any other document to prove what you owe
us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that,
except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of
this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this
Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you
have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early
home equity line of credit application disclosure, in addition to the handbook entitled "When Your Home Is On the Line: What You Should Know About
Home Equity Lines of Credit," given with the application.

09/. )11 11:12 FAX 502 880 7423          LOAN VAULT )

℡009

Loan No: 2047039          **CREDIT AGREEMENT AND DISCLOSURE**
                                    (Continued)

Page

This Agreement is dated March 15, 2004.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE
EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

X _____          (Seal)
   Mark R. Label, Individually

Effective Disbursement Date:  **3·19·04**

ʊʊⁱⁱ ⁱⁱ:ⁱ² FAX 802 860 7423          LOAN VAUL...

☑010

Loan No: 2047039

## CREDIT AGREEMENT AND DISCLOSURE
### (Continued)

Page :

## BILLING ERROR RIGHTS
### YOUR BILLING RIGHTS
### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at

Maine Bank & Trust Company
P O Box 819
467 Congress St
Portland, ME 04104

or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

LASER PRO Lending, Ver 5.41.00.005  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved. - ME  c:\HarlandPR\SMILE  FL-...

09/30/2011 11:08 FAX 802 860 ~~~   LOAN VAULT              )              ☑002

RECORDATION REQUESTED BY:
   Maine Bank & Trust Company
   . Falmouth Branch
   188 US Route 1                              Doc#:   17933 Bk:20983 Pg:   8
   Falmouth, ME 04105

WHEN RECORDED MAIL TO:
   Maine Bank & Trust Company
   Falmouth Branch
   188 US Route 1
   Falmouth, ME 04105

SEND TAX NOTICES TO:
   Maine Bank & Trust Company
   Falmouth Branch
   188 US Route 1
   Falmouth, ME 04105
_____

                                        SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

## MORTGAGE

**DEFINITIONS.** The following words are used often in this document. When they are used, they will have the following meanings:

**Borrower.** Mark R. Lebel and all other persons and entities signing the Credit Agreement will sometimes be called "Borrower".

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement signed by Borrower and dated March 15, 2004 with a credit limit of $150,000.00. The words "Credit Agreement" include all renewals of, extensions of, modifications of, and substitutions for the credit agreement. Specifically, without limitation, this Security Instrument secures a revolving line of credit, which obligates Lender to make future advances to Borrower up to a maximum principal amount of $150,000.00 outstanding at any one time, so long as Borrower complies with all the terms of the Credit Agreement. **NOTICE TO OWNER: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.**

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Security Instrument.

**Lender.** Maine Bank & Trust Company will be called "Lender."

**Owner.** Mark R. Lebel and Donna M. Lebel sometimes will be called "Owner" and sometimes simply "I" or "me." If I sign this Security Instrument, but I do not sign the Credit Agreement, I am signing this Security Instrument only to grant and convey my interest in the Property to Lender. In such a case, I will not be personally liable under the Credit Agreement except as otherwise provided by contract or law, such as a guaranty of the Credit Agreement.

**Property.** The property that is described in the section titled "DESCRIPTION OF THE PROPERTY" will be called the "Property"

**Security Instrument.** This mortgage document will also be called the "Security Instrument."

**Sums Secured.** The amounts described below in the section titled "OWNER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY" sometimes will be called the "Sums Secured." The lien of this Security Instrument will not exceed at any one time the principal amount of $150,000.00, plus interest and other advances Lender makes which are necessary to protect Lender's security interest.

**THIS MORTGAGE IS DATED March 15, 2004, BETWEEN Mark R. Lebel and Donna M. Lebel,** whose address is 6 Eastern Avenue, Falmouth, ME 04105 (sometimes below will be called "Owner," "I," or "me"); and **Maine Bank & Trust Company,** whose address is Falmouth Branch, 188 US Route 1, Falmouth, ME 04105 (sometimes below will be called "Lender").

**OWNER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY.** I mortgage, grant and convey to Lender the Property, subject to the terms of this Security Instrument, to have and to hold all of the Property to Lender, and to its successors and assigns, forever. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property. Those rights that the law gives to lenders who hold mortgages on real property include those rights known as "Mortgage Covenants." I am giving Lender these rights to protect Lender from possible losses that might result if Borrower or I fail to do any of the following:

   (A) Pay all the amounts that Borrower and I owe Lender as stated in the Credit Agreement;

   (B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

   (C) Keep all of my other promises and agreements under this Security Instrument.

**DESCRIPTION OF THE PROPERTY.** I mortgage, grant and convey to Lender the Property described in (A) through (I) below.

   (A) This Property is located in Cumberland County, State of Maine:

         See Exhibit A, which is attached to this Security Instrument and made a part of this Security Instrument as if fully set forth herein.

The Real Property or its address is commonly known as 6 Eastern Avenue, Falmouth, ME 04105.

   (B) All buildings and other improvements that are located on the Property described in subparagraph (A) of this section;

   (C) All rights in other property that I have as owner of the Property described in subparagraph (A) of this section. These rights are known as "easements, rights and appurtenances attached to the Property;"

   (D) All rents and royalties from the Property described in subparagraph (A) of this section;

   (E) All mineral, oil and gas rights and profits, water rights and stock that are part of the Property described in subparagraph (A) of this section;

   (F) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subparagraph (A) of this section;

   (G) All fixtures that are now or in the future will be on the Property described in subparagraphs (A) and (B) of this section;

   (H) All of the rights and property described in subparagraphs (B) through (G) of this section that I acquire in the future; and

   (I) All replacements of or additions to the Property described in subparagraphs (B) through (I) of this section.

**OWNER'S RIGHT TO MORTGAGE THE PROPERTY AND OWNER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY.** I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims



EXHIBIT
B

09/30/2011 11:09 FAX 802 860 ̄  ́3      LOAN VAULT      )           @004

Doc#1   17933 Bk:20983 Pg:   9

Loan No: 2047039                    **MORTGAGE**
                                    **(Continued)**
                                                                    Page 2

## UNIFORM COVENANTS

**I PROMISE AND I AGREE WITH LENDER AS FOLLOWS:**

**BORROWER'S PROMISE TO PAY.** This Security Instrument directly secures payment by Borrower to Lender on time of all principal and interest due under the Credit Agreement.

**APPLICATION OF BORROWER'S PAYMENTS.** Unless the law requires otherwise, Lender will apply each of Borrower's payments under the Credit Agreement and this Security Instrument in the following order and for the following purposes: (A) First, to the extent permitted by law and the terms of the Credit Agreement and this Security Instrument, to pay any unpaid collection costs, attorneys' fees and expenses incurred by the Lender to enforce the Credit Agreement or this Security Instrument; (B) Next, to pay any interest due under the Credit Agreement; (C) Last, to pay principal due under the Credit Agreement.

**OWNER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS.** I will pay all taxes, assessments, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will do this by making the payments on time to the person owed them. (In this Security Instrument, the word "person" means any person, organization, governmental authority or other party.) If I make direct payments, then promptly after making any of those payments I will give Lender a receipt which shows that I have done so.

Any claim, demand or charge that is made against the Property because an obligation has not been fulfilled is known as a "lien." I must promptly pay or satisfy a superior lien unless: (A) I agree, in writing, to pay the obligation which gave rise to this superior lien and Lender approves the way in which I agree to pay that obligation; or (B) In good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give me a notice identifying the superior lien. I will then pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Security Instrument:

    **Existing Lien.** The lien of this Security Instrument securing the Sums Secured may be secondary and inferior to the lien securing payment of an existing obligation with an account number of 01-01246966 to Chittenden Trust Company DBA Mortgage Service Center ATTN: Gail Halvorson – Loan Library   described as: mortgage loan dated 06/12/03 and recorded in the Cumberland County Registry of Deeds in Book 19390, Page 53. The existing obligation has a current principal balance of approximately $140,475.00 and is in the original principal amount of $143,000.00. The obligation has the following payment terms: $1,210.00 per month. I expressly covenant and agree to pay, or see to the payment of, the Existing Indebtedness and to prevent any default under the Existing Indebtedness.

    **No Modification.** I shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Security Instrument by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. I shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**OWNER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE.** I will obtain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. If the Property is or becomes located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, I agree to obtain and maintain Federal Flood Insurance for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender. I agree to maintain such insurance for the term of the loan. In no event, however, shall I be required to provide hazard insurance in excess of the replacement value of the buildings and other improvements on the Property. I may choose the insurance company, but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable.

All of the insurance policies and renewals of those policies must include what is known as a "standard mortgagee clause" to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or to restore the damaged Property unless: (A) it is not economically feasible to make the repairs or restoration; or (B) the use of the proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (C) Lender and I have agreed in writing not to use the proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the proceeds will be used to reduce the amount that is owed to Lender under the Credit Agreement and under this Security Instrument. If any of the proceeds remain after the amount that is owed to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, or if I do not answer, within thirty (30) days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which is owed to Lender under the Credit Agreement, that use will not delay the due date or change the amount of any of the monthly payments under the Credit Agreement and under the Paragraph titled "MONTHLY PAYMENTS FOR TAXES AND INSURANCE" above. However, Borrower and Lender may agree in writing to those delays or changes.

If Lender acquires the Property as provided below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

**OWNER'S OBLIGATION TO MAINTAIN THE PROPERTY.** I will keep the Property in good repair. I will not destroy, damage or substantially change the Property, and I will not allow the Property to deteriorate.

**HAZARDOUS SUBSTANCES.** I promise that the Property never has been and never will be used for the generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous substance, hazardous waste, or hazardous matter, as those terms are used in any federal or state law governing any such use ("Hazardous Matter Laws"). I promise to protect Lender and the Property from any loss under any Hazardous Matter Law. I promise to pay Lender any losses or costs Lender may incur because of Hazardous Matter Laws applying to the Property or its use or condition. This promise will continue to be effective even after the Mortgage is paid in full and discharged.

**LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY; MORTGAGE INSURANCE.** If (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph, Lender does not have to do so.

To the extent permitted by law, I will owe Lender any amounts, with interest, which Lender spends under this Paragraph. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will also pay interest on those amounts at the Credit Agreement rate. Interest on each amount will begin on the date that the amount is spent by Lender. However, Lender and I may agree in writing to terms of payment that are different from those in this paragraph. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If Lender required mortgage insurance as a condition for my loan, I will pay the premiums for that mortgage insurance. I will pay the premiums until the

10/07/2011 11:34 FAX 502 660   23          LOAN VAULT          DOC#                                    2013

Loan No: 2047039                    **MORTGAGE**
                                    **(Continued)**

                                                                                        Page 3

Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property, or if I do not answer, within thirty (30) days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which is owed to Lender under the Credit Agreement, that use will not delay the due date or change the amount of any of the monthly payments under the Credit Agreement. However, Lender and I may agree in writing to those delays or changes.

**CONTINUATION OF OWNER'S OBLIGATIONS AND OF LENDER'S RIGHTS.**

**Owner's Obligations.** Lender may allow a person who takes over my rights and obligations to delay or to change the amount of the monthly payments of principal and interest due under the Credit Agreement or under this Security Instrument. Even if Lender does this, however, that person and Borrower will both still be fully obligated under the Credit Agreement and under this Security Instrument.

Lender may allow delays or changes for a person who takes over my rights and obligations, even if Lender is not requested to do so. Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Credit Agreement or under this Security Instrument, even if Lender is requested to do so.

**Lender's Rights.** Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right to demand immediate payment in full of the amounts that are owed to Lender under the Credit Agreement or under this Security Instrument.

**OWNER'S OBLIGATIONS AND THOSE OF PERSONS TAKING OVER OWNER'S OBLIGATIONS.** Any person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

If more than one person signs this Security Instrument as Owner, each of us is fully obligated to keep all of Owner's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Credit Agreement: (A) that person is signing this Security Instrument only to give that person's rights in the Property to Lender under the terms of this Security Instrument; and (B) that person is not personally obligated to pay the Sums Secured; and (C) that person agrees that Lender may agree with the other Owners to delay enforcing any of Lender's rights or to modify or make any accommodations with regard to the terms of this Security Instrument or the Credit Agreement without that person's consent.

**LOAN CHARGES.** If the Credit Agreement secured by this Security Instrument is subject to a law which sets maximum Credit Agreement charges, and that law is finally interpreted so that the interest or other Credit Agreement charges collected or to be collected in connection with the Credit Agreement exceed permitted limits: (A) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Credit Agreement or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Credit Agreement.

**LEGISLATION AFFECTING LENDER'S RIGHTS.** If a change in applicable law would make any provision of the Credit Agreement or this Security Instrument unenforceable, Lender may require immediate payment in full of all Sums Secured by this Security Instrument as that phrase is defined above. If Lender requires immediate payment in full under this Paragraph, Lender will take the steps and may act as specified below.

**NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT.** Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class, certified or registered mail unless applicable law requires use of another method. The notice will be addressed to me at the address shown at the beginning of this Security Instrument. A notice will be given to me at a different address if I give Lender notice of my different address. Any notice that must be given to Lender under this Security Instrument will be given by mailing it to the Lender's address shown at the beginning of this Security Instrument. A notice will be mailed to Lender at a different address if Lender gives me a notice of the different address. A notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph or of applicable law.

**LAW THAT GOVERNS THIS SECURITY INSTRUMENT.** This Security Instrument will be governed by and interpreted in accordance with federal law and the laws of the State of Maine. This Security Instrument has been accepted by Lender in the State of Maine.

**OWNER'S COPY.** I will be given one conformed copy of the Credit Agreement and of this Security Instrument.

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED.** Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may require immediate payment in full if a beneficial interest in Owner is sold or transferred and Owner is not a natural person. However, Lender will not require immediate payment in full if this is prohibited by federal law as of the date of this Security Instrument.

If Lender requires immediate payment in full under this Paragraph, Lender will give me a notice which states this requirement. The notice will give me at least thirty (30) days to make the required payment. The 30-day period will begin on the date the notice is mailed or delivered. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**DEFAULT.** At Lender's option, I will be in default under this Security Instrument if any of the following happen: (A) I commit fraud or make a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Borrower's or my income, assets, liabilities, or any other aspects of Borrower's or my financial condition. (B) Borrower does not meet the repayment terms of the Credit Agreement after Lender gives Borrower any notice of default and opportunity to cure required by applicable law. (C) My action or inaction adversely affects the collateral for the credit line account or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the Property, failure to pay taxes, death of all persons liable on the credit line account, transfer of title or sale of the dwelling, creation of a lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**OWNER'S RIGHT TO HAVE LENDER'S ENFORCEMENT OF THIS SECURITY INSTRUMENT DISCONTINUED.** Even if Lender has required immediate payment in full, I may have the right to have enforcement of this Security Instrument discontinued. I will have this right at any time before a sale of the Property under any power of sale granted by this Security Instrument or at any time before a judgment has been entered enforcing this Security Instrument if I meet the following conditions:

    Borrower or I pay to Lender the full amount that would have been due under this Security Instrument and the Credit Agreement if Lender had not required immediate payment in full; and

    Borrower or I correct my failure to keep any of my other promises or agreements made in this Security Instrument; and

    Borrower or I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, permissible fees; and

    Borrower or I do whatever Lender reasonably requires to assure that Lender's rights in the Property are secure. Lender's rights under this Security Instrument, and my obligations under the Credit Agreement and under this Security Instrument continue unchanged.

If all of the conditions in this Paragraph are fulfilled, then the Credit Agreement and this Security Instrument will remain in full effect as if immediate payment in full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required immediate payment in full under the Paragraph titled "LEGISLATION AFFECTING LENDER'S RIGHTS,"

09/30/2011 11:10 FAX 802 880 323                 LOAN VAULT                          )                    @005

Loan No: 2047039                           **MORTGAGE** Doc#   17933 Bk:20983 Pg:  11
                                           (Continued)
                                                                                                   Page 4
_____

- the conditions stated in subparagraphs (A), (B) and (C) below are not met.

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs allowed by law. These costs include permissible fees, costs of title evidence.

Lender may require immediate payment in full under this paragraph only if all of the following conditions are met:

I fail to keep any promise or agreement made in this Security Instrument, including the promise to pay when due the Sums Secured.

Lender sends to me, in the manner described above, a notice that states (a) The promise or agreement that I failed to keep; (b) The action that I must take to correct that default; (c) A date by which I must correct the default. That date must be at least thirty (30) days from the date on which the notice is given; (d) That if I do not correct the default by the date stated in the notice, Lender may require immediate payment in full, and Lender or another person may acquire the Property by means of foreclosure and sale; (e) That if I meet the conditions stated in the Paragraph titled "OWNER'S RIGHT TO HAVE LENDER'S ENFORCEMENT OF THIS SECURITY INSTRUMENT DISCONTINUED" above, I will have the right to have Lender's enforcement of this Security Instrument discontinued and to have the Credit Agreement and this Security Instrument remain fully effective as if immediate payment in full had never been required; and (f) That I have the right in any lawsuit for foreclosure and sale to argue that Borrower or I did keep all promises and agreements under the Credit Agreement and under this Security Instrument, and to present any other defenses that Borrower or I may have.

I do not correct the default stated in the notice from Lender by the date stated in that notice.

Lender's Rights to Rental Payments and to Take Possession of the Property. If Lender requires immediate payment in full, or if I abandon the Property, then Lender, persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (1) collect the rental payments, including overdue rental payments, directly from the tenants; (2) enter on and take possession of the Property; (3) manage the Property; and (4) sign, cancel and change leases. If Lender notifies the tenants that Lender has the right to collect rental payment Lender has the right to collect rental payment directly from them under this Paragraph, I agree that the tenants may make those rental payments to Lender without having to ask whether I have failed to keep my promises and agreements under this Security Instrument. All rental payments collected by Lender or by a receiver, other than any rent paid by me, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, permissible fees, and the cost of any necessary bonds.

Judicial Foreclosure. Lender may obtain a judicial decree foreclosing my interest in all or any part of the Property.

My Payment of Rent. If there is a judgment for Lender in a lawsuit for foreclosure and sale, I will pay to Lender reasonable rent from the date the judgment is entered for as long as I occupy the Property. However, this does not give me the right to occupy the Property.

Payment During Foreclosure. I agree that Lender may accept rents from the Property, hazard insurance proceeds, condemnation awards, and any other monies produced by the Property or paid by me, even though Lender has demanded immediate payment in full and has begun foreclosure and sale proceedings. Lender may use such monies to pay off any part of the Sums Secured without affecting Lender's right to continue foreclosure and sale.

Election of Remedies. All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of my obligations under this Security Instrument, after my failure to do so, that decision by Lender will not affect Lender's right to declare me in default and to exercise Lender's remedies.

Expenses. If Lender forecloses on the Property, all reasonable expenses Lender incurs in realizing on the Property will become part of the Sums Secured. Such expenses would include, for example, reasonable costs related to any foreclosure hearing or foreclosure sale of the Property.

**LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT.** When Lender has been paid all amounts due under the Credit Agreement and under this Security Instrument and I elect to terminate the Credit Agreement, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Security Instrument:

Amendments. Any alteration or amendment of this Security Instrument shall be in writing.

Merger. There shall be no merger of the interest or estate created by this Security Instrument with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

Time is of the Essence. Time is of the essence in the performance of this Security Instrument. This means that all deadlines for performance provided under this Security Instrument must be strictly complied with and that failure to do so will result in a default.

Waivers and Consents. Lender shall not waive any rights under this Security Instrument unless the waiver is in writing and signed by Lender. A waiver of any one right will not affect Lender's other rights. Lender will not lose or affect its rights if it delays in enforcing them.

I ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS SECURITY INSTRUMENT, AND I AGREE TO ITS TERMS.

_____

THIS SECURITY INSTRUMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS SECURITY INSTRUMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

OWNER:

X _____ (Seal)    X _____ (Seal)
    Mark R. Lebel, Individually                   Donna M. Lebel, Individually

_____

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF ___Maine___                        )
                                            ) SS
COUNTY OF ___Cumberland___                  )

On this day before me, the undersigned Notary Public, personally appeared Mark R. Lebel and Donna M. Lebel, to me known to be the individuals described in and who executed the Mortgage, and acknowledged that they signed the Security Instrument as their free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this ___15th___ day of ___March___, 20 ___04___.

By ___Heather T Smith___                        Residing at ___Windham___

09/30/2011 11:09 FAX 502 66C )23      LOAN VAULT            )                    @003

Doc# 17933 Bk:20983 Ps: 12

## EXHIBIT A

Parcel One: A certain lot or parcel of land, with the buildings thereon, situated in the Town of Falmouth, County of Cumberland and State of Maine, bounded and described as follows:

Beginning at a point on the northerly side of Eastern Avenue, said point being 322 feet easterly of the intersection of the easterly boundary of the gray Road and southerly boundary of said Eastern Avenue;

Thence on a course of North 11° 00' 00" West a distance of 400 feet to a point;

Thence on a course of North 74° 00' 00" East a distance of 250 feet to a point on the easterly boundary of a proposed street;

Thence South 11° 00' 00" East a distance of 400 feet to the northerly boundary of said Eastern Avenue;

Thence westerly along the northerly boundary of said Eastern Avenue a distance of 250 feet to the point of beginning.

TOGETHER with an easement for all purposes over said Eastern Avenue to the Gray Road, said easement being 570 feet long and a second easement 450 feet long over the proposed street abutting the easterly side of the property herein conveyed and easterly end of said Eastern Avenue.

Being the same premises conveyed to the Grantors by warranty deed from Anthony C. Mancini, et al. dated February 6, 1975 and recorded in the Cumberland County Registry of Deeds in Book 3656, Page 305.

ALSO another lot or parcel of land in said Falmouth bounded and described as follows:

Beginning at a point which is the southeasterly corner of land now or formerly of Mark R. Lebel, et al. above described and on the northerly boundary of Eastern Avenue;

Thence northerly along the easterly boundary of said Level land a distance of 300 feet to a point;

Thence easterly at a right angle a distance of 85 feet to a point;

Thence southerly on a line parallel with said Lebel land a distance of 300 feet to a point;

Thence westerly by a right angle a distance of 85 feet to the point of beginning, containing 25,500 square feet.

Being the same premises conveyed to the Grantors by deed of Anthony C. Mancini, et al. dated January 6, 1986 and recorded in the Cumberland County Registry of Deeds in Book 7635, Page 193.

EXCEPTING herefrom, a certain lot or parcel of land granted to Joseph C. Anania and Anna D. Anania dated January 26, 1986 and recorded in the Cumberland County Registry of Deeds in Book 7635, Page 191 and Anthony C. Mancini and Jane E. Mancini dated June 26, 1986 and recorded in said Registry of Deeds in Book 7635, Page 195.